# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Richard John LaFountaine,

      Plaintiff,

v.

Dave Reishus, David Paulson,
Stephen Craane, Barb Nelson,
and Kathy Reid, individually and
in their official capacities,

      Defendants.

Civ. No. 13-355 (DSD/JJK)

**REPORT AND
RECOMMENDATION**

---

Richard John LaFountaine, OID # 203751, Minnesota Correctional Facility – Oak Park Heights, 5329 Osgood Ave. N., Oak Park Heights, MN 55082, *pro se*.

Scott A. Grosskreutz, Esq., Minnesota's Attorney General's Office, counsel for Defendants Reishus, Paulson, Nelson, and Reid.

Charles A. Gross, Esq., and Andrea P. Hoversten, Esq., Geraghty, O'Loughlin & Kenney, P.A., counsel for Defendant Craane.

---

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

This matter is before the Court on Motions for Summary Judgment and for Statutory Dismissal pursuant to Minn. Stat. § 145.682 by Defendants Dave Reishus, David Paulson, Barb Nelson, Kathy Reid, and Stephen Craane.  (Doc. No. 98; Doc. No. 93.)  Plaintiff Richard John LaFountaine is a Minnesota state

prisoner incarcerated at the Minnesota Correctional Facility at Oak Park Heights, Minnesota ("MCF-OPH").  LaFountaine filed a Complaint for violation of his civil rights under 42 U.S.C. § 1983, alleging denial of medical care in violation of the Eighth Amendment and Fourteenth Amendment, as well as medical malpractice. (Doc. 1, Compl. 4–5.)  Specifically, LaFountaine asserts that Defendants denied him appropriate medical care for "permanent physical injuries and harm he received" after taking two medications prescribed by Dr. Craane.  (*Id.*) LaFountaine seeks injunctive relief as well as compensatory and punitive damages.  (*Id.* at 5.)

Defendants Reishus, Paulson, Nelson, and Reid move for summary judgment on multiple grounds.  Defendant Dr. Craane likewise moves for summary judgment and dismissal of Plaintiff's Complaint.  Finally, Plaintiff files a motion alleging that Defendants altered documents from his medical record filed under seal with this Court.  These motions have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.  For the reasons that follow, this Court concludes that Defendants' motions should be granted, Plaintiff's motion be denied, and this case be dismissed with prejudice.

## BACKGROUND

### I.   Medical Care at DOC-OPH; Plaintiff's Medical Concerns and Treatment

The Minnesota Department of Corrections ("DOC") provides health services to offenders who have been committed to the custody of the DOC commissioner.  (Doc. 105, Paulson Aff. ¶ 3.)  During the period relevant to Plaintiff LaFountaine's claims, the DOC contracted with a correctional medical services vendor, Corizon, to provide medical care to inmates in its custody.  (*Id.*)  As a Corizon physician, Defendant Dr. Craane evaluated and treated Plaintiff for a variety of medical concerns at MCF-OPH.  (Doc. 95, Craane Aff. ¶ 5.)

During this same period, the other Defendants served in various capacities within the DOC.  Dr. David Paulson has served as DOC Medical Director since 1995.  (Paulson Aff. ¶ 1.)  His role is to "evaluat[e] complaints regarding medical care provided at DOC correctional facilities and monitor[] the DOC's contract with . . . Corizon, as it relates to complaints."  (*Id.*)

David Reishus has served as Associate Warden of Operations at DOC-OPH since October 2011.  (Doc. 102, Reishus Aff. ¶ 1.)  Although the record does not specify his duties, Reishus stated he "do[es] not have authority to override the treatment decisions of . . . physicians" and "[is] not in the medical chain of command for grievance[s]."  (*Id.* ¶ 4.)  Of Reishus' position, Dr. Paulson notes, "If [the Associate Warden had] concerns about an offender's medical care,

his only options would be to relate those concerns to Health Services Staff."
(Paulson Aff. ¶ 19.)

Kathy Reid, a licensed and registered nurse, has worked at DOC-OPH since 2003.  (Doc. 104, Reid Aff. ¶ 1.)  As Health Services Administrator, Reid "manag[es] the administration and operation of health services at [OPH]," including the supervision of nursing supervisors and the provision of "administrative direction" to Corizon practitioners.  (*Id.* ¶ 2.)  Reid "do[es] not have authority to override the treatment decisions of a Corizon practitioner" or to order tests, medical procedures, or referral to off-site specialists.  (*Id.*)  If she had concerns about care provided by a Corizon practitioner, she would raise them with the practitioner or her supervisors at the DOC Central Office.  (*Id.*; *see also* Paulson Aff. ¶ 19.)

Also a registered nurse, Barbara Nelson has served as Nursing Supervisor for the outpatient clinic at MCF-OPH since 2004, except for six months during 2013 when she served as Health Services Administrator at MCF-Stillwater.  (Doc. 106, Nelson Aff. ¶ 1.)  In addition to supervising nurses, Nelson "handl[es] quality assurance issues and answer[s] kites[1] from inmates regarding co-pays and complaints about staff."  (*Id.* ¶ 2.)  Like Reid, Nelson may not override the treatment decisions of Corizon practitioners.  (*Id.*; *see also* Paulson Aff. ¶ 19.)

---

[1]     Kites are written communications between inmates and facility staff. (Doc. 103, Monio Aff. Ex. A, at 1; *see also infra* II. DOC Grievance Policy; Plaintiff's Kites and Grievances.)

LaFountaine first received treatment for his medical concerns related to his claims on June 29, 2011, when Dr. Craane prescribed Lodine[2] and baclofen[3] to treat Plaintiff's self-reported low back and lower extremity pain.  (Craane Aff. ¶ 12; Doc. 96, Gross Aff. Ex. A, oph 71.[4])  At that time, Plaintiff did not complain of any "sensory loss or parasthesia [sic]."[5]  (*Id.*)  Included in Plaintiff's record was an MRI of Plaintiff's lumbar spine performed during an emergency room visit earlier in 2011.  (*Id.*)  Dr. Craane reviewed the MRI, which lacked a radiologist's report but indicated "disc protrusion."  (*Id.*)  Dr. Craane noted that Plaintiff experienced "tenderness and spasm" in the back and "discomfort" in a specific area of his spine.  (*Id.*)  Plaintiff exhibited some difficulty moving, but could crouch with relative ease and had a "slow, but stable" gait.  (*Id.*)  Dr. Craane later obtained the radiologist's report, but the report's findings "did not indicate a need for a change in the care or a . . . specialist evaluation."  (Craane Aff. ¶ 13; Gross Aff. Ex. A, oph 72.)

---

[2]     Lodine is a brand name for etodolac, an anti-inflammatory medication often used to treat osteoarthritis.  THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1028, 612 (4th ed. 2000).

[3]     Baclofen is a muscle relaxant often used to treat multiple sclerosis. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 91 (11th ed. 2003).

[4]     "[O]ph" is a Bates-stamping designation that appears on pages of Plaintiff's medical records submitted as Exhibit A to Gross's affidavit.

[5]     "[P]aresthesia is defined as "[a] skin sensation, such as burning, prickling, itching, or tingling, with no apparent physical cause."  THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1281 (5th ed. 2011).

During the remainder of 2011, Dr. Craane and other providers repeatedly treated Plaintiff for his pain symptoms.  At an August 10, 2011, visit with Dr. Craane, Plaintiff complained of low back pain that increased when he walked, as well as paresthesias in his right foot.  (Craane Aff. ¶ 14; Gross Aff. Ex. A, oph 72.)  He requested Vicodin[6] and a surgical consultation.  (*Id.*)  Dr. Craane observed Plaintiff crouch with no apparent difficulty and walk "at a brisk pace" (Gross Aff. Ex. A, oph 72), a level of activity that "belie[d] his claimed pain." (Craane Aff. ¶ 14; Gross Aff. Ex. A, oph 72.)  Given Plaintiff's "excellent physical functioning," Dr. Craane found no need for a surgical consultation.  (*Id.*)  Nor did he find reason to prescribe Vicodin, a medication intended for short-term use, to treat Plaintiff's chronic low back pain.  (*Id.*)  Instead, Dr. Craane replaced the Lodine with a stronger anti-inflammatory called Voltaren.[7]  (*Id.*)  He also ordered a physical therapy evaluation "to determine [Plaintiff's] true functioning." (*Id.*)

On August 24, 2011, Plaintiff again reported low back pain but no "focal motor weakness, sensory loss, or paresthesia."  (Craane Aff. ¶ 15; Gross Aff. Ex. A, oph 73.)  He requested stronger medication for his pain, although he was able to move and walk with no apparent difficulty.  (*Id.*)  The next month, Plaintiff

---

[6]     Vicodin is a brand-name pain medication containing an opioid analgesic and acetaminophen. *Physicians' Desk Reference* 590 (67th ed. 2013); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 64 (4th ed. 2000) (definition of analgesic).

[7]     Voltaren is a brand name for diclofenac, a non-steroidal medication used to treat arthritis pain. *See Physicians' Desk Reference* 1309 (67th ed. 2013).

complained of continued pain while appearing to move without difficulty and walk "in a based and stable fashion."  (Craane Aff. ¶ 16; Gross Aff. Ex. A, oph 74.)

On October 3, 2011, Plaintiff was seen by physical therapist Darin Haugland for his "ongoing back and bilateral leg symptoms, including weakness and pain." (Craane Aff. ¶ 17; Paulson Aff. Ex. F, at 121–22.)  Haugland performed a neurological evaluation of Plaintiff and noted that the results were "fairly unremarkable." (*Id.*)  He concluded that Plaintiff's pain was caused in part by "weakness and poor core strength" and fitted Plaintiff with a brace, which helped reduce Plaintiff's pain. (*Id.*)  At Haugland's suggestion, Dr. Craane prescribed Elavil[8] as a pain-modifying agent, but Plaintiff refused to take it. (Craane Aff. ¶ 17; Paulson Aff. Ex. H, at 169.)  Dr. Craane subsequently prescribed a different pain-modifying medication, Neurontin.[9] (*Id.*)  Haugland re-evaluated Plaintiff on October 24, 2011, and found that "the patient's extreme subjective complaints do not match physical evidence or observation." (Craane Aff. ¶ 18; Paulson Aff. Ex. F, at 121.)

In early November 2011, Dr. Craane presented Plaintiff's case to a group of Corizon medical providers, who agreed that "[w]atchful waiting" was the most

---

[8]    Elavil is a brand name for amitriptyline, an antidepressant medication. THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 574, 59 (4th ed. 2000).

[9]    Neurontin is a brand name for gabapentin, a medication used to treat Restless Legs Syndrome and neuralgia (nerve pain). *See Physicians' Desk Reference* 985 (67th ed. 2013); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1181 (4th ed. 2000) (definition of neuralgia).

appropriate course of evaluation and treatment.  (Craane Aff. ¶ 19; Gross Aff. Ex. A, oph 76.)  Shortly thereafter, Dr. Craane again saw Plaintiff, whose medical record indicated that Plaintiff had complained of increased back pain he attributed to a fall from a transport vehicle.  (Craane Aff. ¶ 20; Gross Aff. Ex. A, oph 76.)  However, Dr. Craane evaluated video of the incident and a written statement by a DOC staff member and found no evidence to support Plaintiff's story.  (*Id.*)  During the evaluation, Plaintiff claimed he never said he fell from the transport vehicle, but he reported continued pain and difficulty waking.  (*Id.*)  He reported no allergic reactions relating to his medications.  (*Id.*)  Dr. Craane planned to obtain X-rays and added Tylenol to Plaintiff's medications.  (*Id.*)  Taken the following day, the X-rays showed disc degeneration consistent with prior radiological studies. (Craane Aff. ¶ 21; Paulson Aff. Ex. J, at 139.)

At Plaintiff's next visit, on November 18, 2011, Dr. Craane and Haugland together evaluated the patient, who complained of "severe neck pain . . . with associated weakness and numb paresthesias in his upper extremities. . . ." (Craane Aff. ¶ 22; Gross Aff. Ex. A, oph 77.)  Plaintiff re-told his story that he sustained injury by falling from the transport vehicle.  (*Id.*)  He stated he had been taking Neurontin and baclofen but reported "no adverse reaction to either medication."  (*Id.*)  Dr. Craane told Plaintiff that evaluation by a neurologist "could not be medically supported" and there was no reason to send him to an emergency room.  (*Id.*)  Haugland recommended monitoring of Plaintiff's

neurologic symptoms and advised Plaintiff to increase his physical activity. (Craane Aff. ¶ 22; Paulson Aff. Ex. H, at 120.)

Approximately one month later, on December 15, 2011, Dr. Craane discontinued baclofen after Plaintiff repeatedly refused the drug.  (Craane Aff. ¶ 23; Paulson Aff. Ex. H, at 166.)  On December 18, 2011, Plaintiff submitted a kite to Nelson requesting cancellation of all his medications (Monio Aff. Ex. B, at 245), and Dr. Craane discontinued Plaintiff's medications on December 20, 2011. (Craane Aff. ¶ 23; Paulson Aff. Ex. H, at 166.)

A week later, on December 27, 2011, Plaintiff submitted a "sick call" kite in which he complained of "bad reaction with severe side effects from the Backlofen [sic] . . . that caused permanent physical injuries to my neck, arms, hands, fingers . . . and all my nerves and joints which go numb with paresthesia." (Monio Aff. Ex. B, at 244.)  Plaintiff alleged that "Dr. Craane previously prescribed the Backlofen [sic] in June 2011 and continued to inform me to keep taking [it] through the present time, however, I have taken it upon myself to cansel [sic] all my medication on December 18, 2011."  (Monio Aff. Ex. B, at 244.)  On December 28, 2011, Nelson noted Plaintiff's December 27 kite in her progress notes, stating that Plaintiff "has [complained of] same in past[—]see MD notes of 12/18/11 and nurse notes of 12/2/11."  (Nelson Aff. ¶ 4; Paulson Aff. Ex. G, at 105.)  The record includes no physician notes from December 18, 2011.

Then, on January 4, 2012, Plaintiff spoke to Dr. Craane about his alleged severe reaction to his medications during an evaluation at which Nelson also was

present.  (Craane Aff. ¶ 24; Gross Aff. Ex. A, oph 78–79.)  Plaintiff reported that

he experienced "numb paresthesias in his left lower extremity" after he started

taking baclofen in June 2011.  (*Id.*)  These paresthesias, Plaintiff noted, "spread .

. . to his upper left extremity and then to the entire right side of his body," causing

him to stop taking the drug.  (*Id.*)  Dr. Craane noted Plaintiff's reports of "exquisite

[neck] pain" even though Plaintiff could move his neck freely.  (*Id.*)  He further

observed that Plaintiff could easily perform complex movements, had "intact"

sensation, and exhibited a "based and stable" gait.  (*Id.*)  Plaintiff's reported

paresthesias seemed "bizarre" to Dr. Craane in light their "symmetric nature, lack

of any motor compromise, and lack of any incontinence."  (*Id.*)  Accordingly, Dr.

Craane spoke with Dr. Michael Sethna, the consulting neurologist, about

Plaintiff's "unusual symptoms" and claims of a severe reaction to baclofen.

(Craane Aff. ¶ 25; Gross Aff. Ex. A, oph 79.)  Dr. Sethna "saw no basis for

[Plaintiff's] claims that baclofen caused his nerve damage."  (*Id.*)

Dr. Craane and other providers continued to evaluate and treat Plaintiff in

2012 and 2013.  In February 2012, Dr. Craane, Haugland, and Nelson together

evaluated Plaintiff for chronic pain.  (Craane Supp. Aff. ¶ 5; Gross Aff. Ex. A, at

oph 80.)  At Plaintiff's request, Dr. Craane again prescribed Neurontin (Craane

Supp. Aff. ¶ 5; Gross Aff. Ex. A, oph 188), but he found that Plaintiff's condition

and functioning did not justify an MRI.  (Craane Supp. Aff. ¶ 5; Gross Aff. Ex. A,

oph 80.)  Later that month, another physician, Dr. Majid, discontinued Plaintiff's

treatment with Neurontin "per [DOC] policy"[10] (Craane Supp. Aff. ¶ 8; Gross Aff. Ex. A, oph 189).

Dr. Craane, Haugland, and Nelson re-evaluated Plaintiff on March 16, 2012.  (Craane Supp. Aff. ¶ 10; Gross Aff. Ex. A, oph 83.)  Dr. Craane noted "chronic pain issues; par[e]sthesias, palmer [sic] aspects of both hands . . . and paresthesias, bilateral lower extremities, potentially secondary to nerve compression by muscle spasm." (*Id.*)  Although Plaintiff requested a "painkiller," Dr. Craane determined that "this class" of medication would not likely address Plaintiff's underlying condition.  (*Id.*)  Dr. Craane instead prescribed an alternative medication that Plaintiff refused to take.  (Craane Supp. Aff. ¶ 10; Gross Aff. Ex. A, oph 269.)

In response to multiple kites submitted by Plaintiff,[11] Reid visited Plaintiff in his cell on April 2, 2012.  (Reid Aff. ¶ 4; Paulson Aff. Ex. G, at 097.)  According to Reid's progress notes, "[Plaintiff] [c]ontinues to desire pain Rx's.  Moves about freely in room, laid on floor, [and] sat on hands on counter." (Paulson Aff. Ex. G, at 097.)  Plaintiff contends he "put pressure on his hands in order to show . . . the burning redness." (Doc. 4-1, at 10.)  He also states Reid "asked [him] if he needed 'ice' for his severe burning skin," but Plaintiff explained that "cold cement [was the] only relief for burning skin." (*Id.*)  Based on her observations and

---

[10]    Dr. Craane noted that Dr. Majid provided "no further explanation" for his decision to discontinue Plaintiff's Neurontin.  (Craane Supp. Aff. ¶ 10.)

[11]    *See infra* II. DOC Grievance Policy and Plaintiff's Grievances.

evaluation of Plaintiff, Reid "did not see any objective findings that would warrant further evaluation." (Reid Aff. ¶ 4; Paulson Aff. Ex. G, at 097.) She further stated she "informed [Plaintiff] that he should sign up for a sick call if his symptoms continued or progressed" (Reid Aff. ¶ 4), although her progress notes do not reflect this direction.

On April 26, 2012, Plaintiff saw another physician, Dr. Leon Malachinski, for his reported "severe burning of his skin . . . on his feet, legs, hands, face, elbow, or any place on his body." (Craane Supp. Aff. ¶ 11; Gross Aff. Ex. A, oph 84.) Dr. Malachinski found these symptoms to indicate "a slight increase in erythema"[12] and assessed "hyperesthesia,[13] rule out histamine release"; he planned to prescribe Benadryl for a two-week period. (*Id.*) A month later, Plaintiff saw Dr. Craane for the same basic symptoms—"burning paresthesia which seems to be activated by pressure." (Craane Supp. Aff. ¶ 12; Gross Aff. Ex. A, oph 84–85.) Plaintiff reported "no focal motor weakness or sensory loss" and acknowledged that the Benadryl "help[ed] somewhat against the skin condition." (*Id.*) Dr. Craane noted no erythema but wrote "paresthesias . . . question histamine reaction; and chronic pain." (*Id.*) He prescribed another drug and continued medical management. (*Id.*)

---

[12]    "Redness of the skin caused by dilatation and congestion of the capillaries, often a sign of inflammation or infection." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 605 (5th ed. 2011).

[13]    "An abnormal or pathological increase in sensitivity to sensory stimuli, as of the skin to touch. . . ." *Id.* at 865.

Dr. Craane next evaluated Plaintiff in mid-June 2012 "for his multifocal myalgias[14] and paresthesias." (Craane Supp. Aff. ¶ 13; Gross Aff. Ex. A, oph 86.) Plaintiff again reported "no focal motor weakness or sensory loss" but related an occurrence of bowel incontinence. (*Id.*) He requested that Dr. Craane send him to the hospital for "studies." (*Id.*) Dr. Craane assessed chronic pain even though Plaintiff exhibited no physical manifestations consistent with such pain. (*Id.*) He noted that neither an MRI nor CT scan was indicated but that he would continue to monitor Plaintiff's condition. (*Id.*) In late June, Dr. Craane met with Dr. Paulson, Reid, Reishus, and others to discuss Plaintiff's physical symptoms and complaints. (Craane Supp. Aff. ¶ 15; Gross Aff. Ex. A, oph 140.) Conference notes state, "No significant medical issues found to date." (Reid. Aff. Ex. A.) The group would continue monitoring Plaintiff's symptoms and perform "consistent, thorough evaluations." (*Id.*)

On July 25, 2012, Dr. Craane saw Plaintiff for "re-evaluation of multifocal myalgias and paresthesias." (Craane Supp. Aff. ¶ 16; Gross Aff. Ex. A, oph 87.) He assessed chronic pain and indicated he would prescribe a "pain modifying medication." (*Id.*) Dr. Craane evaluated Plaintiff again in mid-August 2012. (Craane Supp. Aff. ¶ 17; Gross Aff. Ex. A, oph 87–88.) Beforehand, he reviewed a note stating that Plaintiff had refused his medications and runs during "rec times." (*Id.*) Dr. Craane also watched a video showing Plaintiff running and

---

14    "Pain or tenderness in one or more muscles." *Id.* at 1164.

directly observed Plaintiff walking "in a based and stable fashion" with no difficulty or apparent discomfort.  (*Id.*)  When Dr. Craane visited Plaintiff in his cell, however, Plaintiff "immediately reported pain and paresthesias."  (*Id.*)  Dr. Craane assessed chronic pain symptoms but noted "no apparent deficit of physical function."  (*Id.*)  Dr. Craane told Plaintiff that he "lack[ed] . . . any visible physical impairment" and "reminded him of numerous medications that have been tried for his reported pain and paresthesias," which Plaintiff had briefly taken then refused.  (*Id.*)  Plaintiff stated he "wishe[d] no further medications," so Dr. Craane canceled Depakote[15] and one other drug.  (*Id.*)  Dr. Craane advised Plaintiff to inform clinic staff "should he experience further difficulties." (*Id.*)

Dr. Craane saw Plaintiff four more times in 2012.  (*See* Craane Supp. Aff. ¶ 18–20; Gross Aff. Ex. A, oph 89–92.)  During these evaluations, Plaintiff reported chronic pain while exhibiting normal physical functioning.  Dr. Craane responded by ordering laboratory studies, prescribing and modifying Plaintiff's drug regimen, and planning to consult with other providers.

On January 11, 2013, after speaking with a dermatologist and neurologist, Dr. Craane noted that the consultations "provided no additional etiology for [Plaintiff's] reported paresthesias."  (Craane Supp. Aff. ¶ 21; Gross Aff. Ex. A, oph 92.)  He further noted that Dr. Sethna, the neurologist, found no indication for

---

[15]    Depakote is a brand name for divalproex sodium, a medication used to treat bipolar disorder, seizures, and migraine headaches. *Physicians' Desk Reference* 437 (67th ed. 2013).

a neurological evaluation.  (*Id.*)  Dr. Craane continued medical management,

stating he "may need to have the patient consider that his symptoms do not have

a physical origin." (*Id.*)

Plaintiff again reported chronic pain at a January 23, 2013, visit with Dr.

Craane.  (Craane Supp. Aff. ¶ 22; Gross Aff. Ex. A, oph 93.)   According to the

doctor, Plaintiff could "bend on one knee . . . without difficulty" when unaware of

the doctor's presence; once Plaintiff became aware of the doctor's presence,

however, he "exhibited great difficulty" in performing this movement.  (*Id.*)  Dr.

Craane also referred to reports by DOC staff stating Plaintiff "remains quite active

when medical personal are not around and . . . attend[s] recreation sessions

regularly." (*Id.*)  Noting that Plaintiff's condition may be psychiatric in origin, Dr.

Craane nonetheless stated that "patient was not willing to entertain this at this

time." (*Id.*)

In his February 6, 2013, notes, Dr. Craane documented telephone

conversations he had with Dr. Paulson and Corizon Regional Medical Director,

Dr. Williams.  (Craane Supp. Aff. ¶ 23; Gross Aff. Ex. A, oph 94.)  Dr. Craane had

discussed with his colleagues Plaintiff's condition, including the results of his

examinations, laboratory studies, and X-rays.  (*Id.*)  Dr. Williams recommended a

psychiatric evaluation, while Dr. Paulson suggested MRI scans to "rule out" an

early form of multiple sclerosis.  (*Id.*)  Dr. Craane requested scans the same day.

(Gross Aff. Ex. A, oph 252.)

According to Dr. Paulson, Plaintiff's MRI results were similar to those of an MRI performed in 2011. (Paulson Aff. ¶ 17.)  Although the new MRI showed abnormalities, it neither indicated multiple sclerosis nor explained Plaintiff's symptoms.[16]  (*Id.*; *see* Gross Aff. Ex. A, oph 255–61.)   Dr. Craane discussed the results of the MRI with Plaintiff on March 20, 2013.  (Craane Supp. Aff. ¶ 24; Gross Aff. Ex. A, oph 94.)  He also evaluated Plaintiff, noting no additional erythema but assessing paresthesias and neck pain "per patient report."  (*Id.*)

For the next six months, Dr. Craane continued to evaluate and treat Plaintiff.  (*See* Craane Supp. Aff. ¶ 25, 28–29; Gross Aff. Ex. A, oph 95, 96.2–96.3.)  Dr. Craane noted Plaintiff's self-reported pain, prescribed medication for his symptoms, and ordered additional tests.  At the same time, he directly observed Plaintiff's positive physical functioning and reviewed video evidence appearing to contradict Plaintiff's physical complaints.  Also during this period, nurse practitioner Michele Murphy saw Plaintiff for his "burning sensation[s]" but found no objective abnormalities.  (Craane Supp. Aff. ¶ 27; Gross Aff. Ex. A, oph 96.1.)  And, in November 2013, Reid again visited Plaintiff in his cell.  (Reid Aff. ¶ 4; Paulson Aff. Ex. G, at 079.)  According to her progress notes, Plaintiff

---

[16]   Dr. Paulson discussed the results of the MRI with Corizon Regional Medical Director, Dr. Staber, and then with Dr. Craane.  (Paulson Aff. ¶ 18; Gross Aff. Ex. A, oph 94.)  The physicians concluded that "a surgical consultation was not indicated."  (Paulson Aff. ¶ 18.)  Additionally, Dr. Paulson asked Dr. Staber to review the MRI results with a spine surgeon, who confirmed that Plaintiff "did not have a lesion that required surgery."  (*Id.*)

complained of burning skin on his left shoulder, although "no redness of left shoulder area [was] observed." (Paulson Aff. Ex. G, at 079.) Reid states she "informed [Plaintiff] that he should sign up for a sick call if his symptoms continued or progressed" (Reid Aff. ¶ 4), although the notes do not reflect this direction (*see* Paulson Aff. Ex. G, at 079). She further maintains she discussed the visit with Dr. Craane "for a possible second opinion from Dr. Staber" (Reid Aff. ¶ 4), but this assertion is unsubstantiated by the record (*see* Paulson Aff. Ex. G, at 079).

During the period in which Plaintiff received the medical care described above, Plaintiff also communicated with Associate Warden of Operations Reishus about his physical symptoms. In his Complaint, Plaintiff alleges that "Reishus visited plaintiff on numerous occasions and the plaintiff <u>informed</u> . . . Reishus that plaintiff's hands, feet, skin was burning . . . and plaintiff requested to go to the hospital. . . ." (Doc. 4-1, at 10.) And Reishus "recall[ed] visiting LaFountaine at his cell . . . on several occasions." (Reishus Aff. ¶ 3.) During these visits, Reishus states, "LaFountaine would often bring up his medical concerns . . . , [and] I would advise him to discuss his . . . concerns with MCF-OPH medical staff." (*Id.*) Plaintiff further communicated with Reishus through the kite process. (*See infra* II. DOC Grievance Policy; Plaintiff's Kites and Grievances.)

## II.    DOC Grievance Policy; Plaintiff's Kites and Grievances

The Minnesota DOC has a formal policy under which an offender may submit a grievance related to a concern that is "personal to the offender."  (Doc. 103, Monio Aff. Ex. A, at 1.)  Before submitting a grievance, the offender must first attempt to resolve his or her concern through informal "kite" communications with facility staff.  (*Id.*)  If the offender believes his or her concern was not resolved through these means, the offender may submit a formal grievance to the facility's grievance coordinator.  (*Id.* at 2.)  When submitting a formal grievance, the offender must include all previous kite communications.  (*Id.*)  Any grievance that "do[es] not indicate the offender attempted to informally resolve the issue" will be returned to the offender.  (*Id.*)  After an appropriate investigation, the warden or a designee decides the grievance.  (*Id.*)  The grievance coordinator then notifies the offender in writing of the decision.  (*Id.*)  If the offender is not satisfied with the response, he or she may submit an appeal with the DOC Central Office.  (*Id.* at 3.)  Once a grievance appeal is decided, the offender may not further appeal administratively.  (*See id.* at 4.)  Only by filing a formal grievance and grievance appeal does an offender exhaust the DOC's administrative remedies.  (Doc. 103, Monio Aff. ¶ 2.)

Between December 18, 2011, and January 9, 2012, LaFountaine submitted numerous kites to facility staff relating to the concerns expressed in his Complaint.  Plaintiff's first kite was directed to Nelson and requested cancellation of all Plaintiff's medications.  (Doc. 103, Monio Aff. Ex. B, at 245.) Nelson

responded, "On Dr.'s concerns." (*Id.*)  LaFountaine's second kite functioned as a

"Sick Call" and received a response of "Noted."  (Doc. 1, Compl. Ex. 1.)  The next

three kites were directed to Nelson, who responded to each by stating that Dr.

Craane had examined Plaintiff on January 4, 2012.  (Doc. 1., Compl. Exs. 2–4.)

Plaintiff submitted two more kites on January 4, 2012.  In a kite directed to

Dr. Craane, Plaintiff requested a chair "because [he] cannot sleep while laying

down and my upper/lower extremities go numb with burning pain . . . ."  (Monio

Aff. Ex. B, at 248.)  A nurse responded, "Concerns given to MD." (*Id.*)  And in a

kite directed to Nelson, Plaintiff reiterated his request for a chair; Nelson noted,

"No chair.  Use your pillow/blanket/clothes, etc. to prop yourself up . . . ."  (Monio

Aff. Ex. B, at 249.)  Finally, Plaintiff submitted kites to Reid and Reishus on

January 9 and 12, 2012, respectively. (Monio Aff. Ex. B, at 240–41.)  Reid

responded by noting that "Dr. Craane recently saw you," while Reishus advised

that, "[f]or medical decisions, the next person in the chain of command is the

DOC Health Services Director at Central Office." (*Id.*)

LaFountaine did not immediately contact the Health Services Director.

Instead, he submitted a formal grievance to Grievance Coordinator Shelly Monio,

who responded by instructing Plaintiff to "send a kite & all documentation to Peg

Gemmell [a]t Central Office."  (Doc. 1, Compl. Exs. 8–9.)  On January 17, 2011,

Plaintiff submitted to the DOC Health Services Director a letter, along with a kite

and supporting documentation, stating he wished to file a grievance.[17]  (Doc. No.

1, Compl., Exs. 10–11; Paulson Aff. Ex. L, at 281–97.)  As DOC Medical Director,

Dr. Paulson reviewed Plaintiff's grievance and medical record, as well as medical

information about treatment with baclofen.  He concluded that baclofen had not

caused the symptoms Plaintiff had reported.  (Paulson Aff. ¶ 13.)  In his response

to Plaintiff, Dr. Paulson noted baclofen's common side effects but stated these

side effects disappear upon discontinuing treatment with the drug.  (*Id.* at 299.)

Should Plaintiff experience symptoms in the future, he should report them to

DOC Health Services staff and follow up with the staff for evaluation of ongoing

symptoms.  (*Id.*)

During the rest of 2012, LaFountaine submitted at least eight additional

kites related to the concerns expressed in his Complaint.  On February 24 and

25, 2012, he submitted two "sick call" kites in which he reported adverse side

effects he claimed to have suffered from taking gabapentin (Neurontin).  (Monio

Aff. Ex. C, at 268, 270.)  In response to the earlier kite, DOC staff noted, "You

need to leave room for a response."  (*Id.* at 268.)  The later kite received a

---

[17]     Plaintiff submitted two additional grievances that appear largely unrelated
to his claims.  On March 20, 2012, Plaintiff submitted a grievance in which he
"request[ed] hospitalization to repair the damage and injuries" relating to an X-ray
diagnosis.  (Monio Aff. Ex. C, at 256.)  In response, Monio sent Plaintiff a memo
stating he had failed to include "copies of ALL kite responses [Plaintiff] received
in the Chain of Command."  (Monio Aff. Ex. C, at 254.)  On August 28, 2012,
Plaintiff re-submitted his grievance to Monio, who responded with a September 5,
2012 memo indicating Plaintiff still had not included all the required
documentation.  (Monio Aff. Ex. D, at 272, 275.)

lengthier response: "I encourage you to not take the Neurontin if you feel you may be having side effects. . . . I will schedule you for sick call if desired.  Please kite back if you would like to be seen."  (*Id.* at 270.)  Also on February 25, 2012, Plaintiff submitted a kite to Dr. Craane complaining of the same medication side effects.  (*Id.* at 269.)  He received the response, "The Neurontin was discontinued today."  (*Id.*)

Plaintiff reiterated his sick-call request in a kite dated February 27, 2012, to which Nelson responded, "Seen by Dr. Mandac on 2-29-12."  (Monio Aff. Ex. C, at 267.)  Nelson further noted, "tests ordered" and "[a]waiting results."  (*Id.*)  Plaintiff then complained of the side effects in a February 28, 2012, kite directed to Reid (Health Services) and a February 29, 2012, kite directed to Nelson.  (Monio Aff. Ex. C, at 265–66.)  In response to the first of these kites, DOC staff noted that Dr. Mandac had seen Plaintiff on February 29, 2012.  (*Id.* at 266.)  In response to the second, Nelson again mentioned the visit with Dr. Mandac, adding "X rays and blood tests ordered" and "[y]ou will be seen within two weeks."  (*Id.* at 265.)  Finally, Plaintiff submitted a kite to Reid on March 5, 2012, in which he alleged Reid had altered a kite and was "tak[ing] unfair advantage of the exhaustion requirement of [the] Prison Litigation Reform Act."  (Monio Aff. Ex. C, at 264.)  Reid did not respond to this kite.  (*See id.*)

On August 3, 2012, Plaintiff submitted one more kite, directed to Dr. Craane, in which he complained of "severe burning of [his] skin" and an "increase in erythema." (Doc. 1-1, Ex. 22.)  He further requested to be sent to the

emergency room for his "spinal injuries."  (*Id.*)  In response, DOC staff stated,

"Noted! No hospital visit indicated!"  (*Id.*)

## PROCEDURAL HISTORY

Plaintiff LaFountaine brings this civil rights action pursuant to 42 U.S.C. §

1983.  He alleges that Defendants, by denying him medical care, violated his

Eighth Amendment right to be free from cruel and unusual punishment and his

Fourteenth Amendment right to due process.  He further alleges medical

negligence by Defendants.  To support his claims, Plaintiff contends he had a

"severe reaction" after taking the two medications that were prescribed by Dr.

Craane.  This reaction included "severe burning" and pain as well as numbness

throughout Plaintiff's body, resulting in "permanent physical injuries." Plaintiff

asserts that Defendants failed to appropriately provide for off-site medical

evaluation and treatment of his condition.  Plaintiff seeks an injunction requiring

Defendants to arrange for his transport to "an off-site hospital or clinic" for

evaluation and "to receive an MRI or CT scan."  He also seeks compensatory

and punitive damages.

Defendants Reishus, Paulson, Nelson, and Reid (DOC Defendants) move

for summary judgment on the following grounds: Plaintiff failed to exhaust his

administrative remedies; the Eleventh Amendment bars Plaintiff's action against

Department of Corrections (DOC) employees in their official capacity;

Defendants did not violate Plaintiff's constitutional rights; DOC Defendants are

protected by qualified immunity; and Plaintiff's medical negligence claim is barred

by the Minnesota Tort Claims Act and must be dismissed for noncompliance with

Minn. Stat. § 145.682.  (Doc. 99, DOC Defs.' Mem. Supp. Mot. Summ. J. (DOC

Defs.' Br.).)  Defendant Dr. Craane likewise moves for summary judgment,

arguing that Plaintiff has failed to establish a *prima facie* case of deliberate

indifference as required for his denial-of-care claim.  And he moves for dismissal

of Plaintiff's Complaint for Plaintiff's alleged failure to serve expert affidavits as

required by Minn. Stat. § 145.682.


## DISCUSSION

### I.    Standard of Review

Summary judgment is proper if there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); *Whisenhunt v. Sw. Bell Tel.*, 573 F.3d 565, 568 (8th Cir. 2009).  In

reviewing the factual record, courts construe the evidence, "and the inferences

that may be reasonably drawn from it, in the light most favorable to the

nonmoving party."  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th

Cir. 2009).  The moving party "bears the initial responsibility of informing the

district court of the basis for its motion" and must identify "those portions [of the

record] which it believes demonstrate the absence of a genuine issue of material

fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving

party has carried this burden, the non-moving party must produce evidence

demonstrating that a trial is required because there exists a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In doing so, the non-moving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49 (1986).[18] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation omitted).

## II.   Exhaustion of Remedies

Under the Prison Litigation Reform Act of 1995 (PLRA), a prisoner may not bring a legal challenge with regard to prison conditions under § 1983 "or any other Federal law" without first exhausting all available administrative remedies. *Porter v. Nessle*, 534 U.S. 516, 516 (2002); *see Booth v. Churner*, 532 U.S. 731, 738–39 (2001). A plaintiff must satisfy exhaustion in "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*,

---

[18]   Although a less stringent standard applies to *pro se* plaintiffs, such plaintiffs "still must present evidence to defeat a properly supported summary judgment motion." *Ramirez v. Harmon*, No. 03-5284 (JRT/AJB), 2006 WL 2583106, *2 (D. Minn. Sept. 1, 2006) (citing *Dunavant v. Moore*, 907 F.2d 77, 80 (8th Cir. 1990)).

534 U.S. at 532. Exhaustion is required even where a plaintiff seeks relief that is unavailable through grievance procedures, such as monetary damages. *See id.* at 740–41. Whether a plaintiff has exhausted all available administrative remedies depends on whether he or she has complied with a prison's grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218 (2007). The Eighth Circuit has stated that a prisoner has exhausted DOC administrative remedies when he has "complete[d] all of the prescribed steps of the . . . Grievance Procedure, and receives a final decision from the assistant or deputy commissioner or Commissioner." *Roth v. Larson*, 2008 WL 4527831, at * 15 (D. Minn. Sept. 30, 2008). Failure to exhaust is an affirmative defense on which a defendant bears the burden of proof. *Id.* at *14. Where prison officials have prevented a prisoner from exhausting the available administrative remedies, a court will not hold the prisoner to the exhaustion requirement. *Lyon v. Vande Krol*, 305 F.3d 806, 808 (8th Cir. 2002).

The DOC Defendants claim that Plaintiff did not exhaust the available administrative remedies and that, therefore, his Complaint should be dismissed. Specifically, Defendants claim that Plaintiff submitted three grievances relating to the concerns expressed in his Complaint. (See Doc. 99, Def.'s Mem. Supp. Mot. Summ. J. (Def.'s Br.) 10; Monio Aff. ¶¶ 4–6.) However, they state that Plaintiff failed to submit the required documentation in proper support of each grievance. (*Id.*) They further contend that Plaintiff never submitted a grievance or grievance appeal to the DOC Central Office.

The three grievances to which Defendants refer correspond to Plaintiff's grievances dated January 13, 2012; March 18, 2012; and August 26, 2012. (Monio Aff. Exs. B–D, at 238, 255, 275.)  Defendants' assertion that Plaintiff neglected to include certain required documentation is supported by DOC staff responses to Plaintiff's grievances (*see supra* II. DOC Grievance Policy; Plaintiff's Kites and Grievances) and a lack of evidence showing Plaintiff ever submitted the required documents.  As noted, Plaintiff's initial grievance, dated January 13, 2012, was defective because Plaintiff had not responded appropriately to an answer given by DOC staff to one of his kites.  (*See supra* II. DOC Grievance Policy; Plaintiff's Kites and Grievances.)  Hence Monio's response: "[S]end a kite and all documentation to . . . Central Office."  (Monio Aff. Ex. B, at 238.)  Plaintiff subsequently submitted a letter with kite to the DOC Health Services Director, to which Dr. Paulson replied.  (Doc. No. 1, Compl., Exs. 10–11; Paulson Aff. Ex. L, at 281–97.)  But to cure his initial attempted grievance, Plaintiff should have resubmitted the grievance and his correspondence with Dr. Paulson.

Plaintiff contends that Monio's response to his initial grievance was a grievance "denial" (dismissal) and his letter to the Health Services Director a grievance appeal.[19]  (*See* Doc. 4-1, at 10.)  It is difficult to see how Plaintiff could

___

[19]    This Court infers Plaintiff uses the term "denial" to mean "dismissal" because Plaintiff states he "appealed the denial" (Doc. 4-1, at 10); according to DOC policy, a prisoner appeals from a "dismissal" (*see* Monio Aff. Ex. A).

construe Monio's direction to send a kite to Central Office as a dismissal of his grievance. (*See* Doc. 1, Compl. Exs. 8–9.) Moreover, his subsequent letter to the Health Services Director stated, "Please accept this as my grievance complaint against Dr. Stephen Craane and [Corizon providers]," not "grievance appeal," with nothing to suggest Plaintiff believed his initial grievance had been dismissed. (*See* Paulson Aff. Ex. L, at 281.) Finally, Plaintiff maintains his grievance appeal was dismissed on March 6, 2012 (Doc. 4-1, at 10), but the only correspondence sent to Plaintiff on that date appears to be a letter from Central Office stating, "Per your request . . . I have attached all your original documents." (Compl. Ex. 12.)

Plaintiff's apparent failure to understand the status of his grievance dated January 13, 2012, does not mean that he failed to exhaust DOC administrative remedies. In fact, it appears that Monio may not have properly responded to Plaintiff's initial grievance. In response to Plaintiff's grievance dated March 18, 2012, Monio sent Plaintiff a template "Office Memorandum" stating, "The grievance you submitted will not be entered as a formal grievance for the reason(s) listed below[.]" (Monio Aff. Ex. D, at 272.) She placed a checkmark next to the following statement:

> You did not attach copies of ALL Kite responses you received in the Chain of Command. Refer to Policy #303.100. The Grievance process is for personal issues after you have exhausted the Chain of Command. . . . [O]nce all kite responses have been received you can forward those with the grievance to me.

(*Id.*)  Had Monio provided this Office Memorandum to Plaintiff in response to his January 13, 2012, grievance, he may have better understood the status of his grievance and responded appropriately.

Plaintiff goes on to allege that Monio "used affirmative misconduct and manipulation to deny and not file [his] grievance[] dated January 13, 2012." (Doc. 114, Pl.'s Reply Br. 10.)  Specifically, he notes that Monio incorrectly stated in her affidavit that she sent Plaintiff "the Office Memorandum informing him of the reason's [sic] for the grievance being returned."  (*Id.* at 9; see Monio Aff. ¶ 4.) Plaintiff views this statement as evidence that Monio improperly used her response to his grievance dated March 18, 2012 to dismiss his grievance dated January 13, 2012.  DOC Defendants acknowledge that Monio "mistakenly referred to the kite response as an Office Memorandum."  (Doc. 128, DOC Defs.' Reply Br. 2.)  As stated, however, Monio did not dismiss Plaintiff's grievance by her kite response but rather instructed Plaintiff to submit his documentation to Central Office.  (Doc. 1, Compl. Exs. 8–9.)  Plaintiff's allegation is without merit.

Finally, Plaintiff maintains that Defendants improperly cite his March and August 2012 grievances because those grievances are unrelated to the concerns raised in his grievance dated January 13, 2012, the grievance that forms the basis of his Complaint. Plaintiff's initial grievance pertains to the alleged severe side effects caused by medication prescribed by Dr. Craane.  (Doc. 1, Compl. Exs. 8–9.)  By contrast, the latter two grievances describe Plaintiff's alleged "severe nerve pains" and "severe pain in the . . . brain" with no mention of

28

Plaintiff's medication regimen.  (Monio Aff. Exs. C–D, at 255, 275.)  Moreover,

Plaintiff's Complaint refers only to the first grievance, and Plaintiff included only

that grievance as an exhibit to his Complaint.  (Compl. 3, Ex. 8–10.)  On this

point, Defendants note that Plaintiff's desire to exclude all but the January 17,

2012, grievance and supporting documentation means that Plaintiff's initial

grievance was "his only attempt to comply with the [PLRA]."  (Defs.' Reply Br. 2.)

Given the scope of Plaintiff's Complaint and grievances, and the

statements of both parties, this Court limits its analysis on the exhaustion issue to

Plaintiff's grievance dated January 13, 2012, and related documents.  Plaintiff's

failure to re-submit his initial grievance suggests he did not exhaust DOC's

administrative remedies.  However, an issue exists as to whether Monio

inadequately informed Plaintiff of the status of his grievance and thereby

prevented him from exhausting available administrative remedies.  *See Lyon*,

305 F.3d at 808.  This Court declines to recommend dismissal on exhaustion

grounds.

### III.    Eleventh Amendment

DOC Defendants argue that Plaintiff's claims against them in their official

capacities should be dismissed on two grounds: first, the Eleventh Amendment

bars suits for damages against states in federal court; and second, a plaintiff may

not bring an official-capacity suit against state officials under § 1983.  (Def.'s Br.

11–12.)

A suit against a government official in her official capacity is "not a suit against the official but rather . . . a suit against the official's office."  *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989).  Therefore, an official-capacity action against a state official is "no different from a suit against the state itself."  *Will*, 491 U.S. at 71; *Nicoll v. Roy*, Civ. No. 11-2065 (DWF/JSM), 2011 WL 5079335, at *3 (D. Minn. Oct. 4, 2011) (citing *Will*, 491 U.S. at 71).  Under the Eleventh Amendment, an individual may not pursue damages against a state in federal court "absent waiver by the State or valid congressional override."  *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Nicoll*, 2011 WL 5079335, at *3 (citing *Will*, 491 U.S. at 66).  This restriction is "fully effective in § 1983 actions."  *Nicoll*, 2011 WL 5079335, at *3 (citing *Will*, 491 U.S. at 66).  However, it does not apply to official-capacity suits brought against state officials for prospective relief.  *Id.* at *3 (citing *Hopkins v. Saunders*, 199 F.3d 968, 977 (8th Cir. 1999)).

Defendants are correct that Plaintiff may not bring an official-capacity suit for damages against them.  Such a suit is barred by the Eleventh Amendment as a suit against the state, a restriction that applies to Plaintiff as a § 1983 claimant.  But Plaintiff seeks not only monetary relief but also prospective relief in the form of an injunction.  (Compl. 5.)  And Plaintiff's Complaint may reasonably be construed as stating a claim for damages against Defendants in their individual, rather than official, capacities.  (*Id.* at 1, 5.)  Thus, this Court recommends Defendants' motion be denied to the extent it seeks dismissal under the Eleventh Amendment of any official-capacity claims for damages.

IV.   **Eighth Amendment**

Plaintiff contends that Defendants, by denying him appropriate medical

care, violated both his Eighth Amendment right to be free from cruel and unusual

punishment and his Fourteenth Amendment right to due process.  (Doc. 1,

Compl. 4-5; Doc. 4-1, at 1.)  Denial-of-care claims are properly analyzed under

the Eighth Amendment.  *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir.

1997); *see also Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (citing

*Helling v. McKinney*, 509 U.S. 25, 31 (1993)).  As such, they are not actionable

under the Fourteenth Amendment.  *Cf. Larson v. Roussell*, No. 09-3600

(PAM/AJB), 2011 WL 1533164, at *5 (D. Minn. March 28, 2011) ("Plaintiff cannot

maintain a due process claim . . . because the actions that form the basis of his .

. . claim fall under the Fourth Amendment . . . .").

Originally, the constitutional proscription against cruel and unusual

punishment applied to "barbarous punishments."  *Estelle v. Gamble*, 429 U.S. 97,

102 (1976).  Later, in the twenty-first century, the United States Supreme Court

extended the proscription to punishment that is inconsistent with "evolving

standards of decency[,]" *id.* at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01

(1958)), or entails the "unnecessary and wanton infliction of pain[,]" *id.* at 102–03

(quoting *Gregg v. Georgia*, 428 U.S. 153, 169–73 (1976)).  The Supreme Court

has further held that "deliberate indifference to serious medical needs of

prisoners constitutes . . . 'unnecessary and wanton infliction of pain'" in violation

of the Eighth Amendment.  *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. at

31

173); *see also Dulany*, 132 F.3d at 1237 (citing *Estelle v. Gamble*, 429 U.S. at 103).

To state a valid claim for deliberate indifference to serious medical needs, a prisoner must satisfy both an objective and subjective element.  *Dulany*, 132 F.3d at 1239.  First, the prisoner must demonstrate he "suffered objectively serious medical needs."  *Id.*  A medical need is "serious" if it "has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (1997) (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)).  Second, a prisoner must show that "prison officials actually knew of but deliberately disregarded those needs."  *Dulany*, 132 F.3d at 1239 (citing *Coleman*, 114 F.3d at 784).  By requiring that a plaintiff's medical need be "serious," the law reflects society's belief that prisoners should not have "unqualified access to health care."  *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).  Accordingly, a plaintiff may prevail on a deliberate indifference claim only by showing that "prison officials knew that the condition created an excessive risk to the inmate's heath and then failed to act on that knowledge." *Id.* (quoting *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)).  Unless this threshold is crossed, the prison doctor enjoys "free[dom] [of] independent medical judgment," and the prisoner "ha[s] no constitutional right to . . . a particular or requested course of treatment."  *Id.* at 1239 (citing *Long*, 86 F.3d at 765).  A prison guard may show deliberate indifference by "intentionally deny[ing] or

32

delay[ing] access to medical care or intentionally interfere[ing] with prescribed treatment." *Id.* at 1239. Likewise, a prison doctor may demonstrate deliberate indifference by "fail[ing] to respond to [a] prisoner's serious medical needs." *Id.* But it is not enough for a prisoner to state a claim for medical negligence. *Id.* (citing *Estelle v. Gamble*, 429 U.S. at 106).

Plaintiff's Complaint and exhibits are replete with evidence that Plaintiff believes he suffers from an objectively serious medical need. The Complaint refers to the "severe reaction with severe side effects" Plaintiff allegedly experienced after taking the baclofen and Neurontin prescribed by Dr. Craane. (Compl. 4.) In support of his belief, Plaintiff cites his January 13, 2012, grievance, his various kites, nurse progress notes, and physician notes. (Compl. 5.)

In his grievance, Plaintiff stated that "baclofen . . . caused a bad reaction with severe side effects" while referring to "my Medical Records showing that I was screaming everynight for week's [sic] in my cell." (Monio Aff. Ex. B, at 239.) And further: "Dr. Craane should have known that the baclofen . . . was causing my symptom's and pain after my numerous complaints." (*Id.*) His kites, too, establish that Plaintiff believed he suffered from a serious medical need. (*E.g.*, Compl. Ex. 1 ("I've been having a bad reaction with severe side effects from the baclofen . . . that caused permanent physical injuries."); *id.* Ex. 2 ("I received permanent injuries from the medication Backlofen [sic] and I requested hospitalization to try to repair the nerve damage . . . ."); and *id.* Ex. 7 ("[B]aclofen

caused a bad reaction . . . which requires hospitalization to repair the nerve damage and joint damage.").)

Plaintiff points to nurse progress notes and physician notes as additional evidence of his serious medical need.  He cites Nelson's December 28, 2011 note reading, "Offender [complained of] 'bad reaction and severe side effects from Baclofen . . . .'"  (Compl. 5; Paulson Aff. Ex. G, at 105.)  And he highlights progress notes from May 2012 documenting his "[r]equest to see MD re: burning skin" and a sick call visit "for ongoing complaints of reddened/burning skin."  (Doc. 4-1, at 4; Paulson Aff. Ex. G, at 097.)  Plaintiff also cites many physician ("practitioners") notes.  (Doc. 4-1, at 8–9.)  On July 25, 2012, Dr. Craane wrote that Plaintiff was "concerned with 'burning' paresthesias across his abdomen and in his lower extremities."  (Paulson Aff. Ex. F, at 056.)  And, in December of 2012, Dr. Craane stated, "[P]atient is seen for re-evaluation of his 'burning' paresthesias," while noting Plaintiff's "conviction that he has 'erythema.'"  (*Id.* Ex. F, at 051.)

Just as Plaintiff uses his providers' notes as evidence of his medical need, he challenges those notes when they do not fully reflect his beliefs. On February 25, 2012, the "pill pass nurse" noted Plaintiff "had a sore throat and it hurt when he swolled [sic]."  (Doc. 4-1, at 1; Paulson Aff. Ex. G, at 100.)  But Plaintiff states he "told the . . . nurse he was having a bad reaction to his medication . . . and his throat and tongue was swelling up and its hard to breath—The nurse lied. . . ."  (Doc. 4-1, at 1.)  Plaintiff also attacks the validity of his doctors' notes. On

October 24, 2012, Dr. Craane stated Plaintiff "presses his right hand against the
sink . . . until the finger tips turn bright red" to show he has "paresthesias in the
hand." (Paulson Aff. Ex. F, at 053.) By contrast, Plaintiff contends his "entire
palm and finger's [sic] turn extreamly [sic] red and burn, but, Dr. Craane will not
document or admit that he can . . . see the plaintiff['s] injuries." (Doc. 4-1, at 9.)
Likewise, Dr. Craane noted on January 23, 2013 that "Security staff report . . .
patient remains quite active when medical personnel are not around. . . ."
(Paulson Aff. Ex. F, at 050.) But Plaintiff contends that "Dr. Craane and all the
security staff know I cannot do anything except walk in my cell or walk in the rec-
room." (Doc. 4-1, at 9.)

Taken alone, evidence of Plaintiff's belief that he suffered a severe
reaction from taking medications prescribed by Dr. Craane is insufficient to
establish that Plaintiff has a serious medical need. In *Kayser v. Caspari*, 16 F.3d
280, 281 (8th Cir. 1994), the Eighth Circuit held that a prisoner claiming to suffer
from kidney stones had no serious medical need because his assertion was not
supported by medical evidence. But not all Plaintiff's evidence is purely
subjective. Specifically, Plaintiff cites his visit with Dr. Malachinski on April 26,
2012, during which Plaintiff complained "of severe burning of his skin." (Doc. 4-1,
at 4; Paulson Aff. Ex. F, at 059.) The doctor stated that "[Plaintiff's] skin does
blanch upon pressure and then exudes the reddish color." (Paulson Aff. Ex. F, at

059.)  He also noted "a slight increase in erhythema," assessed "hyperesthesia, rule out histamine release," and planned to prescribe Benadryl.  (*Id.*)[20]

If Dr. Malachinski's notes are construed as evidence that the doctor "diagnosed" in Plaintiff a medical need "requiring treatment," then Plaintiff may be said to have a "serious medical need."  However, a medical need is not serious just because it has been diagnosed as requiring treatment.  Under *Dulany*, a plaintiff's condition must have "created an excessive risk to the inmate's health" or, stated differently, must constitute an "unreasonable risk from which serious damage to [the plaintiff's] future health is imminent."  132 F.3d at 1239, 1244.  As the following discussion shows, Plaintiff has not created a triable issue on whether his medical need rises to this level of severity.

In contrast to Plaintiff's largely subjective account, the record contains abundant medical evidence suggesting he suffered no serious medical need.  Between June 2011 and September 2013, Dr. Craane and other care providers saw Plaintiff more than twenty times for his medical concerns related to his claims.  (*See* Craane Aff. and Craane Supp. Aff.)  Yet, during these visits, Dr. Craane and his colleagues identified no medical basis for Plaintiff's claim that he suffered a severe reaction from having taken baclofen and Neurontin.  (*Id.*)

---

[20]  Additionally, Plaintiff claims to cite the *Physicians' Desk Reference*, which states among the possible side effects of gabapentin (Neurontin) "pain, burning or tingling in the hands or feet."  (Doc. 4-1, at 1; Compl. Ex. 15.)

On November 18, 2011, Dr. Craane first evaluated Plaintiff after he began taking both baclofen and Neurontin.  (Craane Aff. ¶¶ 12, 22; Gross Aff. Ex. A, oph 71, 77.)  Plaintiff reported no medication side effects, and Dr. Craane found no medical support for a specialist evaluation or emergency room visit.  (Craane Aff. ¶ 22; Gross Aff. Ex. A, oph 77.)  Then, on January 4, 2012, Plaintiff spoke to Dr. Craane about his concern that he suffered an adverse drug reaction. (Craane Aff. ¶ 24; Gross Aff. Ex. A, oph 78–79.)  Dr. Craane found Plaintiff's reports of "numb paresthesias" to be "bizarre" in light of Plaintiff's normal physical functioning.  (*Id.*)  The next month, Dr. Craane, Haugland, and Nelson together evaluated Plaintiff, and Dr. Craane determined that an MRI was not warranted. (Craane Supp. Aff. ¶ 5; Gross Aff. Ex. A, oph 80.)  In April, while visiting Plaintiff in his cell, Reid noted "no objective findings that would warrant further evaluation."  (Reid Aff. ¶ 4; Paulson Aff. Ex. G, at 097.)  And a month later, Dr. Craane found no physical manifestations of Plaintiff's pain and no reason to obtain an MRI or CT scan.  (Craane Supp. Aff. ¶ 13; Gross Aff. Ex. A, oph 86.) Dr. Craane evaluated Plaintiff several more times in 2012 but found no indication of Plaintiff's alleged drug reaction.  (Craane Supp. Aff. ¶¶ 14–20.)

This pattern continued through 2013.  At a January visit, Dr. Craane observed Plaintiff's positive physical functioning to conclude that Plaintiff's condition may be psychiatric in origin.  (Craane Supp. Aff. ¶ 22; Gross Aff. Ex. A, oph 93.)  In March, after Dr. Malachinski saw Plaintiff, Dr. Craane evaluated his patient but found no additional erythema.  (Craane Supp. Aff. ¶ 24; Gross Aff. Ex.

A, oph 94.)  During multiple additional visits, Dr. Craane observed direct and

indirect evidence of Plaintiff's condition that contradicted his self-reported

symptoms.  (*See* Craane Supp. Aff. ¶¶ 25, 28–29; Gross Aff. Ex. A, oph 95,

96.2–96.3.)  Finally, a nurse practitioner evaluated Plaintiff but found "no

objective abnormalities."  (Craane Supp. Aff. ¶ 27; Gross Aff. Ex. A, oph 96.1.)

And Reid, after seeing Plaintiff in his cell, noted no visible signs of Plaintiff's self-

reported burning skin.  (Reid Aff. ¶ 4; Paulson Aff. Ex. G, at 079.)

Dr. Craane did more than routinely evaluate Plaintiff; he also consulted

with other providers to ascertain a cause of Plaintiff's symptoms.  On January 12,

shortly after Dr. Craane evaluated Plaintiff for his alleged drug reaction, Dr.

Craane spoke with Dr. Sethna, the consulting neurologist, who "found no basis

for [Plaintiff's] claim that baclofen caused his nerve damage."  (Craane Aff. ¶ 25;

Gross Aff. Ex. A, oph 79.)  Six months later, Dr. Craane discussed Plaintiff's case

with Dr. Paulson, Reid, and others, who agreed that "no significant medical

issues [were] found to date."  (Craane Supp. Aff. ¶ 15; Gross Aff. Ex. A, oph 140;

Reid. Aff. Ex. A.)  And the following January, Dr. Craane spoke with Dr. Sethna

and a dermatologist; together they identified "no additional etiology for [Plaintiff's]

reported paresthesias" and no indication for a neurological evaluation.  (Craane

Supp. Aff. ¶ 21; Gross Aff. Ex. A, oph 92.)  Finally, in February 2013, Dr. Craane

spoke with Dr. Paulson and Corizon Regional Medical Director, Dr. Williams.

(Craane Supp. Aff. ¶ 23; Gross Aff. Ex. A, oph 94.)  Dr. Williams recommended a psychiatric evaluation while Dr. Paulson suggested MRI scans.  (*Id.*)[21]

During the time he treated Plaintiff, Dr. Craane also studied Plaintiff's prior test results and ordered new tests.  Even before Plaintiff reported paresthesias, Dr. Craane reviewed the results of an MRI of Plaintiff's spine that was performed during an earlier emergency room visit.  (Craane Aff. ¶ 12; Gross Aff. Ex. A, oph 71.)  The results showed no need for a change in treatment or specialist evaluation.  (Craane Aff. ¶ 13; Gross Aff. Ex. A, oph 72.)  In October 2012, "to evaluate the patient's paresthesias," Dr. Craane ordered lab tests, which showed "a complete metabolic panel [that] is unremarkable."  (Craane Supp. Aff. ¶ 18; Paulson Aff. Ex. F, at 053–54.)  And, in February 2013, Dr. Craane ordered MRI scans pursuant to Dr. Williams' recommendation.  (Craane Supp. Aff. ¶ 23; Gross, Ex. A, oph 94, 252.)  The scans yielded no additional information.  (Paulson Aff. ¶ 17.)

This court finds Plaintiff has not created a triable issue as to whether he has a serious medical need.  He presents evidence of his belief he suffered a severe medication reaction but offers little medical evidence to support his theory. Assuming, for the sake of argument, that Dr. Malachinski "diagnosed" a medical need "requiring treatment," Dr. Craane subsequently monitored and

---

[21]  Previously, Dr. Craane had talked with Plaintiff about a possible psychiatric evaluation, but Plaintiff would not consider it.  (*See supra* p. 14.)  However, Dr. Craane ordered the MRI, which yielded no further information.  (Gross Aff. Ex. A, oph 252; Paulson Aff. ¶ 17.)

treated this "need."  (*See, e.g.*, Craane Supp. Aff. ¶¶ 12, 19, 24, and 28.)

Nothing in the medical record suggests it constituted an "excessive risk to

[Plaintiff's] health" or an "unreasonable risk from which serious damage to

[Plaintiff's] future health [was] imminent."  Plaintiff tries to establish imminent

harm by citing what he states is a page from the *Physicians' Desk Reference*,

which lists among the possible side effects of gabapentin (Neurontin) "pain,

burning or tingling in the hands or feet."  (Doc. 4-1, at 1; Compl. Ex. 15.)

However, nothing in the record connects this medical information to Plaintiff's

own condition.  Likewise, Plaintiff cites his kite dated August 3, 2012, in which he

states, "Erythema instruction say's [sic], person's [sic] with erythema . . . may

need treatment in a hospital burn unit if 20% or more of their body is affected. . .

."  (Doc. 4-1, at 8; Compl. Ex. 22.)  But Plaintiff presents no evidence linking this

purported medical information to his condition.

Just as Plaintiff cannot establish his "serious medical need" with reference

to medical diagnosis, neither can he show his need is "so obvious that even a

layperson would easily recognize the necessity for a doctor's attention."  In his

Complaint, Plaintiff refers to his "'visable' permanent—physical condition/injuries"

but alleges that Dr. Craane "will not admit he can visually see" those injuries.

(Doc. 4-1, at 5, 7.)  He further contends that DOC staff "cover up" his injuries by

keeping Plaintiff "hidden-away back in the A.C.U" where, he asserts, "nobody can

see or witness" his symptoms or hear his complaints.  (*Id.* at 5–6.)  Yet Plaintiff

offers no evidence to establish the obviousness of his injuries.

In his attempt to establish that Defendants "knew of" his "serious medical need," Plaintiff cites the many occasions on which he informed them of his alleged need.  Dr. Craane knew of Plaintiff's medical concerns because "he visited Plaintiff from the beginning and was aware of plaintiff's severe burning skin. . . ."  (*Id.* at 10.)  Indeed, Plaintiff informed Dr. Craane of his concerns on January 4, 2012, shortly after Plaintiff first complained of his symptoms via a "sick call" kite on December 27.  (Craane Aff. ¶ 24; Gross Aff. Ex. A, oph 78–79; Monio Aff. Ex. B, at 244.)  To establish Dr. Paulson's knowledge, Plaintiff states that Dr. Craane informed him of Plaintiff's physical complaints at a conference of care providers. (Doc. 4-1, at 10.)  In June 2012, Dr. Paulson attended such a conference with Dr. Craane, Reid, and Reishus at which the participants discussed Plaintiff's symptoms.  (Craane Supp. Aff. ¶ 15; Gross Aff. Ex. A, oph 140.)[22]

Plaintiff has shown that the remaining Defendants knew of his alleged medical need as well. He notes that Nelson visited him together with Dr. Craane and Reid on numerous occasions when Plaintiff complained of his symptoms. (Doc. 4-1, at 10; Craane Aff. ¶ 24; Craane Supp. Aff. ¶¶ 5, 10.)  Nelson also recorded Plaintiff's concerns in her progress notes (Paulson Aff. Ex. G, at 097); and she responded to kites in which Plaintiff stated he was suffering from a

---

[22]     Previous to the conference, Dr. Paulson received and responded to the letter Plaintiff sent to him in January 2012.  (Paulson Aff. Ex. L, at 281–99.)  And he discussed Plaintiff's case by phone with Dr. Craane in early 2013.  (Craane Supp. Aff. ¶ 23; Gross Aff. Ex. A, oph 94.)

reaction to his medications (Monio Aff. Ex. B, at 245, 242, 243, 246, 267, 265).

Regarding Reid, Plaintiff correctly states that she visited him in April 2012, and

he quotes from her progress notes based on that visit. (Doc. 4-1, at 10; Reid Aff.

¶ 4; Paulson Aff. Ex. G, at 097.)  Reid also responded to at least one kite in

which Plaintiff stated he suffered an adverse drug reaction.  (Monio Aff. Ex. B, at

241.)  Finally, Plaintiff observes that Reishus, in addition to attending the June

2012 conference, "visited plaintiff on numerous occasions" when Plaintiff

"informed . . . Reishus that plaintiff's hands, feet, skin was burning. . . ."  (Doc. 4-

1, at 10; *see also* Reishus Aff. ¶ 3.)

There is ample evidence to suggest each Defendant knew of Plaintiff's

physical complaints.  However, deliberate indifference requires not merely

knowledge of a plaintiff's need but knowledge that "the condition created an

excessive risk to the [plaintiff's] health."  *Dulany*, 132 F.3d at 1239.  Put another

way, the "unreasonable risk from which serious damage to [Plaintiff's] future

health is imminent" must be "known."  *Id.* at 1244.  Here, Plaintiff has failed to

create a triable issue as to whether his condition "created an excessive risk to

[his] health" or constitutes an "unreasonable risk from which serious damage to

[Plaintiff's] future health is imminent."  (*See supra* pp. 38–39.)  Therefore, Plaintiff

fails to show Defendants knew Plaintiff's condition posed an "excessive" or

"unreasonable" risk of harm.  Even if Plaintiff carried his burden as to the severity

of his medical need, the record provides no evidence that Defendants knew the

risk posed by that need.

This Court next reviews Plaintiff's arguments that Defendants acted with deliberate disregard for his medical needs.  As noted, to prevail on a deliberate indifference claim, a plaintiff must show that prison officials "failed to act on [their] knowledge" that a "condition created an excessive risk of harm to the inmate's health."  *Id.* at 1239.  However, where "medical records indicat[e] that treatment was provided and physician affidavits indicat[e] that the care provided was adequate," a prisoner does not create a triable issue "merely be stating that [he] did not feel [he] received adequate treatment."  *Id.* at 1240.  Rather, the prisoner must show that the treatment "so deviated from professional standards" as to constitute cruel and unusual punishment in violation of the Eighth Amendment.  *Id.* at 1243 (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)).  Even multiple incidences of negligence, to be actionable, require "some specific threat of harm from a related system . . . deficiency."  *Id.* at 1245.

Plaintiff first argues that Dr. Craane "kept insisting plaintiff should keep takeing the medication . . . even after plaintiff's numerous complaints of having severe side effects."  (Doc. 4-1, at 4.)  Plaintiff also alleges that, following his visit with Dr. Malachinski, he asked to be "tested for hyperesthesia" but received no such testing.  (*Id.*)  He goes on to hold each Defendant responsible for refusing to arrange for him to see a specialist "after plaintiff repeatedly complained of burning and pain (for over one year) and . . . continually requested hospitalization."  (*Id.* at 5.)  Instead of the treatment he desired, Plaintiff received medication that "did not work and was so cursory as to amount to no cure at all."

(*Id.*)  In his view, Defendants did "nothing" to relieve his "severe burning and pain" even though he complained "hundreds" of times about his symptoms.  (*Id.*)

The only factual support for Plaintiff's allegation that Dr. Craane insisted he take baclofen is Plaintiff's kite dated December 27, 2011, in which he wrote that Dr. Craane "continued to inform me to keep taking [it] through the present time." (Monio Aff. Ex. B, at 244.)  In his affidavit, Dr. Craane states he "discontinued the baclofen due to numerous refusals by the patient" (Craane Aff. ¶ 23), a statement that is supported by the doctor's notes (Paulson Aff. Ex. H, at 166).  It is possible Dr. Craane first insisted Plaintiff take baclofen, then later agreed to discontinue the drug.  However, Dr. Craane's willingness to stop other medications casts doubt on whether he pressured Plaintiff to take baclofen as alleged.  (*See* Craane Aff. ¶ 17; Paulson Aff. Ex. H, at 169; Craane Aff. ¶ 23; Paulson Aff. Ex. H, at 166.)  Even if Plaintiff raises a genuine issue on this point, the issue is immaterial to Dr. Craane's alleged deliberate indifference unless Plaintiff first has carried his burden on the issue of his alleged serious medical need and Defendants' knowledge of that need.  Even then, Plaintiff has presented no evidence to show that Defendant's actions "so deviated from professional standards" as to constitute cruel and unusual punishment.

Plaintiff also alleges that Defendants refused Plaintiff the care he wanted (i.e., testing, evaluation and treatment by a specialist, and hospitalization).  (Doc. 4-1, at 4-5.)  But a Plaintiff "ha[s] no constitutional right to a particular or requested course of treatment," and physicians "remain free to exercise their

44

independent medical judgment." *Dulany*, 132 F.3d at 1239 (citing *Long*, 86 F.3d at 765). And so, in *Kayser v. Caspari,* the court affirmed a district court's grant of summary judgment in favor of defendant physicians who refused to treat plaintiff for kidney stones where medical evidence did not support plaintiff's self-diagnosis of that ailment. 16 F.3d at 281. *See also Estelle v. Gamble*, 429 U.S. at 107–08 (no deliberate indifference where physicians treated plaintiff's back injury without ordering additional tests); *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995) (disagreement about proper treatment may not give rise to an Eighth Amendment claim); and *Bellecourt v. U.S.*, 994 F.2d 427, 431 (8th Cir. 1993) (no deliberate indifference where physician failed to implement plaintiff's preferred course of treatment).

Plaintiff appears to make an alternative argument that he received no care at all for his serious medical need. As stated, however, between June 2011 and September 2013, Dr. Craane saw Plaintiff numerous times for his medical concerns related to his claims. (*See supra* p. 35.) During these visits, Dr. Craane evaluated Plaintiff, attending to his physical complaints, while attempting to identify an etiology for Plaintiff's self-reported symptoms of burning and numbness. (Craane Aff. and Supp. Aff.) In addition to evaluating Plaintiff, Dr. Craane prescribed medications to treat Plaintiff's symptoms, adjusting and discontinuing these medications as necessary. (*See* Craane Aff. ¶¶ 12, 14, 17, 20, and 23; Craane Supp. Aff. ¶¶ 5, 10, 12, 18–19, and 25). He ordered tests and studied the results (Craane Aff. ¶¶ 20–21; Craane Supp. Aff. 18, 23, 25); at

other times, he determined tests were not indicated (Craane Supp. Aff. ¶ 5, 13).

Following his visits with Plaintiff, Dr. Craane made detailed practitioner notes that

included "subjective" information, including his observations of Plaintiff and

Plaintiff's own perceptions; "objective" information such as Plaintiff's vital signs

and test results; the doctor's medical assessment of Plaintiff's condition; and a

treatment plan reflecting the doctor's ongoing efforts to address Plaintiff's

symptoms while continuing to monitor them.  (*See, e.g.*, Paulson Aff. Ex. F, at

042.)[23]

Furthermore, Dr. Craane actively sought out and relied on other providers

to aid in his evaluation and treatment of Plaintiff.  In August 2011, in response to

Plaintiff's complaints of pain and numbness, Dr. Craane referred his patient to

Haugland, the physical therapist.  (Craane Aff. ¶ 14; Gross Aff. Ex. A, oph 72.)

Haugland's evaluation influenced Dr. Craane's treatment of Plaintiff's pain and

provided evidence that Plaintiff's subjective complaints "do not match" objective

evidence.  (Craane Aff. ¶ 17–18; Paulson Aff. Ex. H, at 169; Ex. F, at 121.)

Shortly thereafter, Dr. Craane presented Plaintiff's case to other Corizon

providers, who agreed that "watchful waiting" was the most appropriate course of

evaluation and treatment.  (Craane Aff. ¶ 19; Gross Aff. Ex. A, oph 76.)  In

---

[23]    According to Dr. Paulson, Plaintiff's medical record includes all his visits
with a health care provider and that "it would be extremely improbable for
[Plaintiff] to interact with a [provider] without a corresponding progress note."
(Paulson Aff. ¶ 9.)  Moreover, Dr. Paulson has sworn that the practitioner notes
included in the factual record are "true and accurate copies . . . [of those] from
[Plaintiff's] visits with Corizon practitioners."  (*Id.*)

January 2012, when Plaintiff's unexplained symptoms persisted, Dr. Craane discussed the case with Dr. Sethna, a neurologist, who "saw no basis for [Plaintiff's] claims" that baclofen had harmed him. (Craane Aff. ¶ 25; Gross Aff. Ex. A, oph 79.) Six months later, Dr. Craane again discussed Plaintiff's case with Dr. Paulson and others, who agreed that "no significant medical issues [were] found to date." (Craane Supp. Aff. ¶ 15; Gross Aff. Ex. A, oph 140; Reid Aff. Ex. A.) Likewise, Dr. Craane's January 2013 consultation with a dermatologist and neurologist "provided no additional etiology" for Plaintiff's complaints; after this meeting, Dr. Craane suggested to Plaintiff that his condition may be psychiatric in origin. (Craane Supp. Aff. ¶ 21; Gross Aff. Ex. A, oph 92.) Finally, in February 2013, Dr. Craane spoke with Dr. Williams, who recommended a psychiatric evaluation, and Dr. Paulson, who influenced him to order an MRI. (Craane Supp. Aff. ¶ 23; Gross Aff. Ex. A, oph 94.)[24]

Not only was Dr. Craane attentive to Plaintiff's medical needs; so too were DOC Defendants. As noted, Dr. Paulson actively conferred with Dr. Craane about Plaintiff's case. However, his primary role is to evaluate complaints regarding the medical care provided at DOC facilities. (Paulson Aff. ¶ 1.) Thus it was proper for Dr. Paulson, upon receipt of Plaintiff's letter in January 2012, to review the medical record and additional medical information before forming the opinion that baclofen had not caused Plaintiff's symptoms. (Paulson Aff. ¶ 13;

---

[24] *See supra* note 14.

Ex. L, at 281–99.)  In his reply letter, Dr. Paulson shared his opinion with Plaintiff while encouraging him to communicate with DOC Health Services staff should he continue to experience symptoms.  (*Id.*)

Reid, too, attended to Plaintiff's concerns. For example, she responded to Plaintiff's kite dated January 6, 2011, in which he complained of numbness throughout his body.  (Monio Aff. Ex. B, at 241.)  Directly but with respect, she wrote: "Dr. Craane recently saw you . . . last week. You were moving all extremities and your head/neck very successfully.  Your condition is monitored very regularly."  (*Id.*)[25]  Reid also visited Plaintiff in his cell.  On April 2, she observed Plaintiff attempt to show her his allegedly visible burning symptoms. (Paulson Aff. Ex. G, at 097.)  By Plaintiff's own account, she showed concern for his comfort by asking him "if he needed 'ice' for his severe burning skin."  (Doc. 4-1, at 10.)  And, in June 2012, Reid participated in the conference at which Dr. Paulson and others agreed they would continue to perform "consistent, thorough evaluations" of Plaintiff.  (Reid. Aff. Ex. A.)

Like Reid, Nelson interacted with Plaintiff through kites and clinical visits. In response to Plaintiff's kite dated December 18, 2011, she wrote only, "Noted!" (Monio Aff. Ex. B, at 244.)  However, in her progress notes, Nelson recorded details about Plaintiff's symptoms taken from his kite.  (Paulson Aff. Ex. G, at 105.)  In later kite responses, she educated Plaintiff on DOC's

---

[25]    It appears Reid failed to respond to one of Plaintiff's kites. *See supra* p. 20.

"Kites/Communication" policy, suggested a way for him to relieve his discomfort, and provided him information on tests performed and future appointment dates. (Monio Aff. Ex. B, at 246, 265, and 267.)  Finally, Nelson was present on multiple occasions when Dr. Craane evaluated Plaintiff.  (*See, e.g.*, Craane App. ¶ 24; Gross Aff. Ex. A.)

As Associate Warden, Reishus' interaction with Plaintiff was relatively limited.  Reishus states he visited Plaintiff in his cell multiple times during his security rounds "to see how he was doing."  (Reishus Aff. ¶ 3.)  During these visits, Plaintiff raised his medical concerns and Reishus advised him to bring those concerns to Health Services staff.  (*Id.*)  Reishus also responded to Plaintiff's kites.  For example, in January 2012 he received a kite in which Plaintiff complained of his alleged continuing reaction to baclofen while citing his many previous kites.  (Monio Aff. Ex. B, at 240.)  Reishus responded: "For medical decisions, the next person in the chain of command is the DOC Health Services Director at Central Office."  (*Id.*)  Reishus' actions suggest concern for Plaintiff's welfare and a willingness to help Plaintiff follow DOC's grievance procedure. (*See* Monio Aff. Ex. A.)

In attending to Plaintiff's needs, Nelson, Reid, and Reishus acted within the scope of their authority.  None of these Defendants may override treatment decisions of Corizon practitioners (Paulson Aff. ¶ 19); nor may they order tests,

medical procedures, or referrals to off-site specialists (*see* Reid Aff. ¶ 2).[26]  In

*Camberos v. Branstad*, the Eighth Circuit found no deliberate indifference where

prison nurses failed to refer the plaintiff to a particular medical center "despite his

repeated complaints of shoulder and arm pain" because they lacked the authority

to do so.  73 F.3d 174, 177 (8th Cir. 1995).  Thus, these Defendants were unable

to provide Plaintiff the treatment he desired, and their failure to do so may not

constitute deliberate indifference.

On these facts, Plaintiff has wholly failed to show Defendants "did nothing"

for his alleged serious medical need.  What remains is his allegation that

Defendants provided inadequate care, for example, drug therapy "so cursory as

to amount to no cure at all."  (Doc. 4-1, at 5.)  Yet Plaintiff's medical records

"indicat[e] that treatment was provided" and "physician affidavits indicat[e] that

the care provided was adequate."  (Paulson Aff. ¶ 20; Craane Aff. ¶ 29; Craane

Supp. Aff. ¶ 30.)  Therefore Plaintiff cannot create a triable issue simply by

alleging inadequate care.  *Dulany*, 132 F.3d at 1240.  Neither can he sustain his

Eighth Amendment claim by showing a deviance from "professional standards"

when he has submitted no evidence to establish what those standards may be or

how Defendants deviated from them.  (*See id.* at 1243.)  Finally, to the extent

---

[26]     Nurses who are "concerned about the adequacy of an offender's care" or
believe a Corizon physician has violated DOC policy may "discuss the concerns"
with the physician.  (Paulson Aff. ¶ 5.)  "At most," nurses "may relay any
concerns . . . to their supervisors."  (*Id.* ¶ 19.)  Reishus' "only option[] would be to
relate those concerns" to DOC Health Services Staff.  (*Id.*)

Plaintiff alleges negligence, nothing in the record suggests he was exposed to "some specific threat of harm" from a "related system . . . deficiency." *Id.* at 1245. For these reasons, Plaintiff has failed to create a triable issue as to whether Defendants deliberately disregarded his medical need.

This Court concludes Plaintiff has failed to carry his burden as to the issues of whether he has a serious medical need and whether Defendants acted with deliberate indifference toward that need. His Eighth Amendment claims against Dr. Craane and DOC Defendants should be dismissed.

**V.   Qualified Immunity**

To the extent Plaintiff has asserted a § 1983 claim against them in their individual capacities, DOC Defendants maintain they are entitled to qualified immunity for alleged violations of Plaintiff's constitutional rights.  The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotations omitted); *Saterdalen v. Spencer*, 725 F.3d 838, 841 (8th Cir. 2013).  To determine whether qualified immunity applies, a court asks (1) whether a constitutional right was violated, and (2) whether the right was "clearly established . . . such that a reasonable official would understand his conduct was unlawful."  *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) (quoting *Vaugn v.*

*Greene Cnty.*, 438 F.3d 845 (8th Cir. 2006)).  A court may exercise "sound

discretion" in deciding which of these questions should be addressed first in light

of the facts of a case.  *Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1228–29

(8th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Qualified immunity shields "all but the plainly incompetent or those who

knowingly violate the law."  *Davis v. Hall*, 375 F.3d 703 (8th Cir. 2004) (quoting

*Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

        This Court has concluded that Plaintiff has created no triable issue as to

whether DOC Defendants acted with deliberate indifference to his serious

medical need.  Because Defendants did not violate Plaintiff's Eighth Amendment

rights, they will not face suit on Plaintiff's claim and qualified immunity will not

apply.  Even if, however, Plaintiff's deliberate indifference claim could be

sustained, no reasonable trier of fact could conclude that DOC Defendants were

"plainly incompetent" or "knowingly violate[d] the law."  Such a finding would be

inconsistent with a factual record suggesting these providers tendered adequate

care in good faith to Plaintiff since before this lawsuit began.  (*See supra* IV.

Eighth Amendment.)  And it would be controverted by physician affidavits stating

DOC Defendants provided "appropriate and consistent treatment" for Plaintiff's

condition.  (Paulson Aff. ¶ 20; *see also* Craane Aff. ¶ 29; Craane Supp. Aff. ¶ 30.)

Thus DOC Defendants would be entitled to qualified immunity against Plaintiff's

claim.

## VI.  Medical Negligence

In addition to claiming a violation of his constitutional rights, Plaintiff

alleges Defendants' actions constituted medical negligence under state law.

(Compl. 4.)  DOC Defendants argue that Minnesota's Tort Claims Act shields

them from liability for medical negligence.  (DOC Defs.' Br. 20.)  And all

Defendants contend they are entitled to dismissal with prejudice of Plaintiff's

negligence claim for his failure to comply with Minnesota's expert review statute.

(DOC Defs.' Br. 20; Def.'s Br. 33; Minn. Stat. § 145.682.)

Under the Minnesota Tort Claims Act, state employees are not liable for

losses "based on the usual care and treatment, or lack of care and treatment, of

a person at a . . . state corrections facility where reasonable use of available

appropriations has been made to provide care[.]"  Minn. Stat. § 3.736, subdiv.

3(l).  DOC Defendants contend they are protected by the statute because they

"clearly took reasonable actions and used appropriate resources available to

them" in providing care to Plaintiff.  (DOC Defs.' Br. 20.)  This court agrees that

Defendants appear to have acted reasonably in caring for Plaintiff; however, the

mere assertion that Defendants "used appropriate resources" in caring for him is

insufficient to establish the fact asserted.  In *Diedrich v. State*, the Minnesota

Court of Appeals held that § 3.736 did not automatically shield the state from

liability against a claim arising from the "usual care and treatment" at a state

hospital.  393 N.W.2d 677, 683 (Minn. Ct. App. 1986).  According to the court,

"the inclusion of the 'reasonable use' language . . . allow[s] the possibility of a suit

based on 'usual care or treatment,' given the proper facts." *Id.* at 683.  Years

later, a federal court relied on *Diedrich* in interpreting the parallel municipal tort

claims statute. *Thornton v. U.S. Dept. of Justice*, 93 F.Supp.2d 1057, 1070–71

(D. Minn. 2000).  The court concluded that the "usual care and treatment"

provision "applies only when a government entity has shown that it made a

reasonable use of available funds in providing plaintiff with care." *Id.* at 1070.  In

that case, although the county "provid[ed] plaintiff with regular physician and

nursing care, with regular medications," the county failed to show it made

reasonable use of available funds because it provided "no evidence pertaining to

the medical expenditures actually made in plaintiff's case." *Id.* at 1070–71.

Likewise, here, DOC Defendants have provided no data on medical expenditures

related to Plaintiff's care.  An issue thus exists as to whether DOC "made

reasonable use of available appropriations to provide care."  Individual-capacity

claims against DOC Defendants should not be dismissed on the ground of

immunity under the Minnesota Tort Claims Act.

Defendants further argue that Plaintiff's negligence claim must be

dismissed for his failure to comply with the expert review and disclosure

requirements of Minnesota statutes § 145.682.  (DOC Defs.' Br. 20; Def.'s Br.

33.)  Under the statute, a plaintiff alleging "malpractice, error, mistake, or failure

to cure[] . . . against a health care provider" must serve two affidavits on the

defendants.  Minn. Stat. § 145.682, subdiv. 2.  These affidavits are required in

any case that "includes a cause of action as to which expert testimony is necessary to establish a prima facie case."[27]  *Id.*

First, the plaintiff must serve an affidavit of expert review with the summons and complaint.  *Id.* § 145.682, subdivs. 2–3.  This affidavit must be by the plaintiff's attorney[28] and state the attorney has reviewed the facts of the case with a qualified expert in whose opinion "one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff." *Id.* § 145.682, subdiv. 3.  Second, the plaintiff must serve an affidavit of expert disclosure no later than 180 days after the commencement of discovery.  *Id.* § 145.682, subdivs. 2, 4.  This affidavit must be signed by the plaintiff's attorney and all the listed experts; identify the experts whom the plaintiff expects to testify at trial; state "the substance of the facts and opinions to which the expert[s] [are] expected to testify"; and summarize the basis for each opinion.  *Id.* § 145.682,

---

[27]    A prima facie case of medical malpractice requires a plaintiff to establish "the standard of care applicable to [the defendant's] acts or omissions, the breach of that standard of care, and the chain of causation" resulting in plaintiff's alleged injury.  *See Tousignant v. St. Louis County*, 615 N.W.2d 53, 61 (Minn. 2000). Expert testimony is typically necessary to establish these elements (*id.*), but it is not needed in cases where "the acts or omissions complained of are within the general knowledge and experience of lay persons."  *Id.* at 58 (quoting *Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 279 (Minn. 1985)).  Such cases are "exceptional" (*id.* at 61); indeed, only "the most obvious medical malpractice claims" do not require expert testimony.  *Haile v. Sutherland*, 598 N.W.2d 424, 428 (Minn. Ct. App. 1999).

[28]    A plaintiff acting pro se must sign the affidavits "and is bound by those provisions [of section 145.682] as if represented by an attorney."  Minn. Stat. § 145.682, subdiv. 5.

subdiv. 4.  Upon motion, the court must dismiss with prejudice plaintiff's cause of action if plaintiff fails to serve either the affidavit of expert review within 60 days of the defendant's demand therefor or the affidavit of expert disclosure within the time prescribed.  *Bjorke v. Mayo Clinic of Rochester*, 574 N.W.2d 447, 450 (Minn. Ct. App. 1998); *see also* Minn. Stat. § 145.682, subdiv. 6(a)–(b).

Defendant Dr. Craane correctly asserts that Plaintiff's claim requires compliance with section 145.682.  (Def.'s Br. 36.)  Plaintiff states his claim as one of "medical negligence" rather than "medical malpractice."  (Compl. 4.)  However, the Minnesota Supreme Court has applied the statute without regard to any distinction between these terms.  *See Wesely v. Flor*, 806 N.W.2d 36, 37 (Minn. 2011) (referring to plaintiff's negligence claim against a dental provider as a "dental malpractice action"); *see also* BLACK'S LAW DICTIONARY 1044 (9th ed. 2009) (defining "malpractice" as "[a]n instance of negligence or incompetence on the part of a professional").  Additionally, all Defendants but Reishus are health care providers.  (*See supra* I. Medical Care at DOC-OPH; Plaintiff's Medical Concerns and Treatment.)  Finally, Plaintiff's cause of action is one "to which expert testimony is necessary to establish a prima facie case."[29]

---

[29]   Plaintiff's claim involves complex medical issues (*see supra* I. Medical Care at DOC-OPH; Plaintiff's Medical Concerns and Treatment).  Accordingly, this Court concludes that expert testimony would be necessary to establish "the standard of care . . . , the breach of that standard of care, and the chain of causation" leading to Plaintiff's asserted injury.  *See Tousignant*, 615 N.W.2d at 61 (2000).

Defendants maintain that Plaintiff failed to serve them with either of the required expert affidavits (DOC Defs.' Br. 21; Def.'s Br. 36-37.); Plaintiff asserts he served both affidavits (Doc. 114, Pl.'s Reply Br. 5.).  Plaintiff did not serve an affidavit of expert review at the time he served his summons and Complaint. (Reishus Aff. § 8; Reid Aff. § 9; Nelson Aff. § 7; Paulson Aff. § 21; *see also* Compl.[30])  Rather, Plaintiff states he submitted this initial affidavit on May 13, 2013.[31]  (Doc. 114, Pl.'s Reply Br. 5.).  But this affidavit fails to state that Plaintiff has "reviewed the facts of the case with a qualified expert" who holds the opinion that "one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff."  (*See* Doc. 23-1, Aff. of Serv.—Cert. Expert Rev.; Aff. Expert Rev.)  It simply lists types of providers Plaintiff intends to call as expert witnesses, then requests the Court appoint an attorney to help him obtain those witnesses.  (*Id.*)  Thus it fails to satisfy the statutory requirements for an affidavit of expert review.

---

[30]   In his affidavit, Dr. Craane neglected to state that he was not initially served with an affidavit of expert review.  However, in his answer to Plaintiff's Complaint, he demanded service of both affidavits.  (*See* Doc. 13, Def.'s Answer 4.)  DOC Defendants also demanded the affidavits in their answer.  (Doc. 15, DOC Defs.' Answer ¶ 13.)

[31]   Plaintiff submitted his affidavit as part of his Motion to Appoint Counsel. (Doc. 23-1, Aff. of Serv.—Cert. Expert Rev.; Aff. Expert Rev.)  The actual date of service is unknown, so it is impossible to establish whether Plaintiff served his purported affidavit within sixty days of Defendants' demand therefor.  But this Court need not establish that date: for the reasons set forth above, what Plaintiff refers to as his affidavit of expert review fails to meet the requirements of such an affidavit.

Plaintiff likewise states he submitted the second required affidavit, the affidavit of expert disclosure. (Doc. 114, Pl.'s Reply Br. 5.). In his "Affidavit of Service—Identification of Expert and Opinion," Plaintiff names three specific providers from whom he seeks medical evaluation for the purpose of securing "their testimony, summaries or depositions of the facts and opinions of plaintiff's injuries." (Doc. 117-5, Ex. 290–98.)[32] However, the affidavit is not signed by the listed providers, nor does it state "the substance of the facts and opinions to which the expert[s] [are] expected to testify" or summarize the basis for their opinions. Accordingly, Plaintiff's second affidavit also fails to meet the statutory requirements.

This Court concludes that Plaintiff's negligence claim should be dismissed with prejudice pursuant to the mandatory dismissal provisions of Minnesota statutes section 145.682, subdiv. 6.

## VII. Plaintiff's Motion to/for Motion Dispute Concerning Altered Medical Documents

On March 27, 2013, Plaintiff moved this Court to sanction Defendants and their attorneys for "willfully disobeying a Court Order concerning discovery and willfully alter[ing] the Plaintiff's Medical document(s)." (Doc. 131, Mot. Disp.

---

[32] Once again, the exact date on which Plaintiff served Defendants with this affidavit is unknown; therefore, it cannot be determined whether he served the document within 180 days of the commencement of discovery.

Concern. Altered Med. Docs. 1.)  Specifically, Plaintiff alleges that Defendants altered a document from his medical record and then submitted that document in partial support of their Motions for Summary Judgment.  (*Id.*)  Plaintiff contends Defendants took these actions after this Court granted them permission to file documents under seal.  (*Id.*; *see also* Doc. 86; Doc. 91; Doc. 120; Doc. 127.)  He further notes that Dr. Craane's attorney stated in his affidavit that Plaintiff's health information would be protected.  (Mot. Disp. Concern. Altered Med. Docs. 1; Doc. 122, Grosskreutz Aff. ¶ 3.)  Plaintiff requests this Court deny Defendants' Motions for Summary Judgment and impose default judgment against Defendants under Fed. R. Civ. P. 37(b).  (Mot. Disp. Concern. Altered Med. Docs. 2.)

The medical document to which Plaintiff refers is a "Health Screening form" that Kari Anderson, a registered nurse, completed during her assessment of Plaintiff upon his arrival at MCF-OPH in June 2011.  (Doc. 146, Anderson Aff. ¶ 3.)  Anderson checked "Yes" next to a question addressing whether the PREA (Prison Rape Elimination Act) Checklist had been completed.  (*Id.*)  Much later, on January 2, 2014, DOC Defendants filed Plaintiff's Health Screening form in support of their summary judgment motion.  (Doc. 145, DOC Defs.' Second Reply Br. 2–3; *see also* Doc. 105, Paulson Aff. Ex. K, at 233–34.)  Then, in a kite dated February 23, 2014, Plaintiff wrote to Nelson that Anderson had slandered him by "checking YES to PREA Directive 202.0404 on [his] . . . Check-List Report."  (Mot. Disp. Conc. Altered Med. Docs. Ex. 408; *see also* Doc. 150, Second Nelson Aff. ¶ 5–6.)  In response, Nelson stated that "[n]one of the

accusations you claim are on the checklist. . . ."  (*Id.*)  Plaintiff concluded that

Defendants had altered his checklist after obtaining a copy of it and before filing it

with the court.  (Mot. Disp. Concern. Altered Med. Docs. 1.)

DOC Defendants argue that Plaintiff misunderstood Nelson's response to

his February 23, 2014 kite.  (DOC Defs.' Br. 1.)  They point out that checking

"Yes" next to the PREA question "simply indicates that the . . . checklist had been

completed. . . . [I]t does not provide any additional information pertaining to an

offender or his sexual history."  (*Id.* at 2; *see also* Second Nelson Aff. ¶ 6.)

Therefore, when Nelson reviewed Plaintiff's Health Screening form, she would

not have construed the checkmark as indicating anything slanderous about

Plaintiff.  (*See* Second Nelson Aff. ¶ 5–6.)  She could truthfully state that "none of

the accusations [Plaintiff] claims" were on the form, even though Anderson

marked "Yes" to the PREA question.  (Mot. Disp. Concern. Altered Med. Docs.

Ex. 408; *see also* Second Nelson Aff. ¶ 5–6.)  This theory is consistent with

sworn statements by Defendants and their attorneys that they did not alter

Plaintiff's medical records as alleged.  (Second Nelson Aff. ¶ 7; Doc. 147,

Second Reid Aff. ¶ 3; Doc. 148, Second Reishus Aff. ¶ 3; Doc. 149, Second

Paulson Aff. ¶ 3; Doc. 154, Craane Aff. ¶ 6; Doc. 151, Grosskreutz Aff. ¶ 4; Doc.

155, Gross Aff. ¶ 4; Doc. 156, Hoversten Aff. ¶4.)

This Court concludes that neither Defendants nor their counsel altered

Plaintiff's Health Checklist form before DOC Defendants filed it with the court.

There is simply no basis for finding that they engaged in spoliation of evidence

such as might warrant imposition of sanctions under the relevant law.  *See*

*Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745, 747 n. 2 (8th Cir. 2004).

Moreover, Plaintiff did not satisfy the meet-and-confer requirements of District of

Minnesota Local Rule 7.1(a).[33]  Plaintiff's motion should be denied.


## RECOMMENDATION

Based on the foregoing and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     Defendants' Motions for Summary Judgment (Docs. 93, 98) be

**GRANTED**;

2.     Defendant Dr. Craane's Motion for Dismissal (Doc. 93) be

**GRANTED**;

3.     Plaintiff's Motion to/for Motion Dispute Concerning Altered Medical

Documents (Doc. 131) be **DENIED**; and

4.     This action be **DISMISSED WITH PREJUDICE**.


Date:  July 16, 2014                     *s/Jeffrey J. Keyes*
                                         JEFFREY J. KEYES
                                         United States Magistrate Judge

---

[33]     Plaintiff filed a Meet-and-Confer Statement that cited his kite exchange with Nelson as evidence that he met and conferred with the opposing party. (Doc. 133, Meet-and-Confer Statement.)  However, he failed to satisfy this requirement as to other Defendants in this case.  (*See* Grosskreutz Aff. ¶ 2.)

Under Local Rule 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 31, 2014,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.